## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

DAVID TOMS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

STATE FARM LIFE INSURANCE COMPANY,

Defendant.

CASE NO. 8:21-cv-00736-KKM-JSS

## DEFENDANT STATE FARM'S MOTION TO EXCLUDE TESTIMONY OF SCOTT WITT AND MEMORANDUM IN SUPPORT

State Farm hereby moves to exclude the testimony of Plaintiff's expert, Scott Witt.

## I.   INTRODUCTION

This case relates to State Farm's series 94030 Universal Life insurance policy. Plaintiff David Toms alleges the "cost of insurance" rates State Farm used to calculate monthly deductions from his policy account value were too high.  Count I invokes the Policy provision stating that cost of insurance rates "for each policy year" are "based on the Insured's age on the policy anniversary, sex and applicable rate class."  Plaintiff contends that this means State Farm could consider only the listed factors ("age," "sex," and "applicable rate class") in developing its underlying pricing for this Policy, and claims State Farm breached the Policy by considering other factors like operating costs,

reserves, taxes, and profit goals.[1]  Plaintiff offers an expert, Scott Witt, to opine on what State Farm's rates supposedly should have been under that theory, and uses those "substitute" rates to try to show breach and damages.  For several reasons, Witt's testimony must be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 403.

Plaintiff does not even try to show that Witt's model satisfies ***even one*** of the four factors used in this Circuit to assess reliability of such evidence under *Daubert*, even though the judgments he uses in creating his substitute rates intrinsically depends on actuarial science, Witt's field of expertise.  And Witt not only does not base those substitute rates on "age," "sex," and "rate class," but ignores critical mortality-related factors that affect State Farm's rates across all groups of Insureds, including whether each Insured is a smoker.  These problems render his model unreliable for determining breach and damages and in fact make it wrong for virtually every putative class member.

Witt's Count II approach also fails.  Count II alleges State Farm breached a provision in the Policy stating "The monthly expense charge is $5.00" by considering non-mortality *expenses* in developing its cost of insurance pricing.  Witt's primary model for Count II—namely, his Count I model—does not work because, among other reasons, it assumes "profits" are "expenses."  Witt's alternative Count II model—what

---

[1]  State Farm disputes that this sentence describes or limits the process the company uses to develop its underlying pricing for the Policy, as distinguished from simply describing the personal characteristics State Farm uses to assign cost of insurance rates from its existing rate schedules.  *See Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1153 (7th Cir. 2013); *Bally v. State Farm*, 536 F. Supp. 3d 495, 508 (N.D. Cal. 2021).  Nonetheless, for purposes of the present motion, State Farm assumes Plaintiff's theory is viable.

he calls an "expenses only" model—fails because it does not identify how much any policyholder was overcharged for alleged non-mortality expenses.  And Witt admits some components that he deems improper "expense recovery"—i.e., damages—are mortalitybased, and thus cannot be deemed improper under Plaintiff's theory.  This model also improperly masks significant differences among policyholders.

## II.   BACKGROUND

### A.   Witt's Flawed Count I Model

Count I alleges State Farm should have used cost of insurance rates for each policy year based solely on "the factors enumerated in the policy"— namely, "the Insured's age on the policy anniversary, sex and applicable rate class."  Compl. ¶ 33.  But Witt admitted that trying to develop rates using only those factors would be "nonsense."  McClure Tr. 66:19–21; *see* Reynolds 35 (age, sex, and rate class have no inherent values).[2]  Instead, Witt just read the words "age," "sex," and "applicable rate class" to say "mortality factors."  *E.g.*, Witt ¶¶ 36–37, 40.  From there, he deployed an internal State Farm table showing general death rates among insureds for all State Farm policies (not just this one) from 1988 to 1991, and treated it as a set of cost of insurance rates.  *Id.*  ¶¶ 41–43.  But this table does not display cost of insurance rates at all—just the frequency of death among insureds.  And unlike State Farm's actual cost of insurance

---

[2]  Declarations filed herewith are referenced by witness name. Depositions are referenced by witness name, corresponding to exhibits to Declaration of Cari Dawson, attached to the Notice of Filing of Supporting Exhibits. *See* Dawson Decl. "Toms Tr." (Ex. 1); "Witt Bally Tr1" (Ex. 2); "Witt Bally Tr2 (Ex. 3); "Jaunich Tr." (Ex. 4); "Page Tr." (Ex. 5); "McClure Tr." (Ex. 6); "Witt Tr." (Ex. 7); "Phipps Tr." (Ex. 8).  Because Witt used the same methodology here as in *Bally*, *Page*, *Jaunich*, and *McClure*, Witt ¶¶ 8, 10, 16(c), 45, State Farm cites depositions from those cases.

rate schedules, which are organized by age, sex, and rate class, Witt Ex. G at 18–20, the death rate table does not mention rate classes, *id.* at 16–17.  Witt nonetheless contends that any portion of State Farm's **rates** that exceed these **death statistics** somehow reflects breach and damages.  Witt ¶¶ 44–45, 66–74.

Even if State Farm could only consider "mortality factors" in its cost of insurance pricing, Witt's exclusive reliance on the death rate table was improper because it formed only one early step in State Farm's multi-step process of considering mortality factors in its pricing.  *See* Reynolds 10.  Witt just ignored other key mortality-related steps.

**First**, the death rate table does not reflect the fact that State Farm charged higher rates for tobacco users than non-tobacco users—a distinction that at all times was foundational to its rate structure.  Smoking greatly increases the risk of insuring a person's life, Page Tr. 83:14–20; McClure Tr. 81:4–8, which is why all adult Insureds under State Farm's structure are divided between "Tobacco" and "Non-Tobacco" as part of "rate class."  Witt admitted State Farm charged higher rates for smokers. McClure Tr. 71:23–72:2; 79:20–23; 133:18–22; 142:4–15.  And the State Farm regulatory submission Witt cites states that State Farm developed separate rates "for male tobacco, female tobacco, male non-tobacco, and female non-tobacco (ages 20 and greater)."[3]  Witt Ex. G at 3.  Although Witt admitted this key point and even flagged it for Plaintiff's counsel—asking if he "was missing something"—he never adjusted his report to account for this factor.  Bally Tr1 120:3–16; 127:5–13; Bally Tr2 173:19–174:7.

---

[3]  Mr. Toms' Policy does not mention tobacco, Witt Ex. B at 6–7, 63–64, because it insures his minor children, and only adults are differentiated for tobacco.  *Id.* at 1, 59; Witt Ex. G at 3.

So, under his model, someone who smokes two packs of cigarettes a day and is at risk of a premature death from cancer would pay the same rate as someone who never smoked—and smokers actually get a bonus in Witt's rates because smokers recover more damages under his model than non-smokers.  Witt's only reason for ignoring the different rates for tobacco is that the death rate table he used does not display which deceased insureds smoked and which did not, McClure Tr. 120:6–16—an unsurprising fact because as Witt admits, it was a company-wide table, and State Farm adjusted its mortality figures separately for this Policy to account for tobacco usage.  Page Tr. 109:9– 12; Phipps Tr. 23:13–24:7; 25:3–20; 50:21–55:20.  The result is that the portion of the damages Witt identifies as "non-mortality" parts of State Farm's rates includes significant amounts charged to smokers for their increased mortality risk.  McClure Tr. 99:6–8; 167:19–168:6.

**Second**, Witt improperly added a variable into his substitute rates that appears nowhere in the Policy's "age," "sex," and "applicable rate class" provision—namely, he creates different rates depending on *how long* each Policy was in effect, or "duration." Insurers that differentiate for this factor charge lower rates for more recent policies—on the view that the rate class assigned to a more recent Insured is likely more accurate because that person just went through underwriting.  But neither the Policy here nor State Farm's rates under this Policy differentiates on this basis.  Rather, the only temporal factor is that, for "each policy year," the rates turn on "*the Insured's age* on the policy anniversary" in that year—a separate mode of calculation usually called "attained age."  Witt Ex. B at 13 (emphasis added); Hendren ¶ 49.  By including another,

extraneous factor—how long each Policy was in effect—Witt injects a new mortality-related factor that is not part of the Policy or State Farm's own pricing schedules. *Id.*

This point matters because Witt penalizes longer-term policyholders by applying higher rates to them than to shorter-term policyholders. Hendren ¶ 49. And it produces what he calls "anomalies" in his results, McClure Tr. 161:8–15; Stiroh ¶¶ 29–30, 34–37—because sometimes his substitute rates are higher than State Farm's. McClure Tr. 90: 22–91:1; 99:6–8; 99:25–100:5; 161:8–15. Witt's "solution" is to ignore his rates any time State Farm's rates are lower, Witt ¶ 73; McClure Tr. 121:7–15; 160:7–16—thus creating a but-for world where State Farm would alternate between charging its rates or Witt's rates depending on whichever one leads to a bigger damages award.

### B. Witt's Flawed Count II Model

Count II claims State Farm cannot use the cost of insurance charge to recover non-mortality expenses because the separate "monthly expense charge" caps the recovery of expenses through any other monthly charge. Compl. ¶¶ 38–39. But Witt's Count I model offered as his principal support for Count II does not work because it treats everything above his "mortality-only" rates (including profits, premium taxes, surplus, and myriad other factors) as "expenses," Witt ¶ 77, even though that would mean that mortality-related expenses and profits would constitute damages. Judge Breyer rejected this model in *Bally v. State Farm* , 2022 WL 594798, at *4 (N.D. Cal. Feb. 24, 2022) for just this reason. And it makes no sense—Witt's rationale that it treats anything that is "an expense from the standpoint of the policyholder" as impermissible would swallow the entire "mortality" portion of the cost of insurance charge, effectively capping *all*

monthly charges at $5 and rendering the cost of insurance provision meaningless.

Witt's alternative "expense-only" Count II model also fails. Although it purports to calculate "the lost Account Values for each policy owner attributable only to the part of the loads in COI rates that State Farm intended as expense recovery," Witt ¶¶ 78, 87–97, it neither defines "expenses," nor looks at State Farm documents to see what it actually "intended as expense recovery," *see id.* ¶¶ 77–97. Instead, Witt used process of elimination, deeming anything beyond "mortality" and "profit" in the rates as improper "expenses." *Id.* ¶ 78. He then derived the percentage of State Farm's rates meant for profit "load," added that to his Count I "mortality only" rates, and treated everything else as improper expense recovery. *Id.* ¶ 88.

Although Witt's approach depends on partitioning cost of insurance rates into mortality, profits, and expenses, he admits State Farm's rates were not developed that way, that "[i]t's really impossible to partition what goes where" because "[i]t's just all wrapped together," that "this is not a typical exercise in my experience to try to partition between expenses and profit," and that "[i]n my experience, companies don't make this partition." McClure Tr. 179:24–180:6, 181:19–20; Bally Tr2 42:23–43:11; 98:10–12; *accord* Hendren ¶ 64. Indeed, Witt's process is so far removed from what actuaries do when pricing policies that he said it was "hard for [him] to imagine that any actuary or any person ever would have gone through this exercise if not for some sort of litigation that … brought this about." Bally Tr2 98:5–9; *see also* McClure Tr. 181:20–23 (noting he developed this methodology only because Judge Breyer rejected his prior one). And because he never tried to define or actually identify expenses, he wound up including in

his "expense" bucket a host of factors that bear no relationship to what State Farm intended (or any insurer would intend) as expense recovery, including capital and reserve requirements, persistency, and premium taxes. Bally Tr2 76:21–77:25. And some factors (like reserves and surplus) indisputably are mortality-related and thus did not even belong in a "non-mortality" bucket. Hendren ¶ 65.

The "asset share workbooks" on which Witt chose to rely—in lieu of the pricing studies and related documents State Farm actually used for this purpose—create additional problems for his alternate Count II partitioning model. Witt ¶ 82. The workbooks just display assumptions about State Farm's *aggregate* financial obligations and anticipated revenue streams as a way to ensure the Policy's overall pricing structure will be sufficient for State Farm to meet anticipated financial obligations and profit objectives. Hendren ¶¶ 66–67. But as Witt admitted, they do not partition cost of insurance rates, allow such a breakdown to be done, or provide a formula showing how the rates were derived. McClure Tr. 76:10–22; 181:24–182:3. They also limit the analysis of anticipated profits to a hypothetical 20-year period, and only for five sample ages. Reynolds 45. And Witt consulted no other materials—including State Farm's expense studies—to help him make these adjustments, so his results also are aggregated.

Witt used the workbooks to locate the level of revenue necessary for the Policy to have a weighted average profit objective just above zero, i.e., "break even" at the 20-year mark. Witt ¶¶ 86–88. But there is no basis for cutting off the analysis after 20 years. The Policy was first sold in 1994, and Witt's analysis stops in 2014, but the Policy continues to this day and will continue into the future for decades until the last insured

passes away—with large mortality-related expenses occurring in these later years. Hendren ¶ 63.  There is simply is no basis for his arbitrary cutoff.  *Id*. ¶¶ 62–63.

The workbooks also do not reflect rates for individual policies or groups of policies, as they're only aggregate numbers used to test rates.  Reynolds 45–46; Hendren ¶¶ 66–67.  So Witt did not determine profitability on an individualized basis but calculated an *average* profit percentage.  Witt ¶ 87.  But his Count I theory admitted State Farm did not evenly "load" its rates with allegedly improper expenses across the class because the purported expense "loads" varied by age, sex, and rate class—a point Witt just ignored as to Count II.  *Id*. ¶ 88; McClure Tr. 153:2–154:23.  The resulting averaging approach makes it impossible to determine any individual policyholder's alleged damages.  Witt admitted if he didn't average the profit load—meaning if he didn't blend all ages, sexes, and rate classes—there'd be material differences among Insureds.  Bally Tr2 120:5–123:17.  And as State Farm's expert shows, Witt's averaged data mask wide disparities in expense recovery and conceal many uninjured class members.  *See* Reynolds 78–79.

As with Count I, Witt excluded all instances where State Farm's cost of insurance rate was lower than his and treated classwide damages as the total difference between his replacement account values and policyholders' actual account values.  Witt ¶ 96.

## III.  LEGAL STANDARD

This Court's "gatekeeper" function requires it to assess an expert's methodology and exclude testimony that fails Rule 702 and *Daubert*.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999). The Eleventh Circuit applies a "rigorous three-part inquiry," admitting expert testimony

only if: (1) the expert is qualified on the subject of his or her testimony; (2) the methodology used is sufficiently reliable under *Daubert*; and (3) the testimony assists the trier of fact to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible only if it is *both* relevant *and* reliable. *Daubert*, 509 U.S. at 589.

Courts first must determine if an expert, "by knowledge, skill, experience, training or education," is qualified to testify to "scientific, technical, or other specialized knowledge" to inform relevant issues in the case. Fed. R. Evid. 104(a), 702. The "qualifications" must relate to and support the opinion offered. *See Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368–69 (11th Cir. 2014).

Next, under *Daubert*, the proponent must show that, "by a preponderance of the evidence, [the testimony] is reliable." *Allison v. McGhan Med. Corp*, 184 F.3d 1300, 1312 (11th Cir. 1999). Courts must assess (1) whether a technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error" and whether there are controlling standards; and (4) whether there is "general acceptance" of the technique in the "relevant scientific community." *Daubert*, 509 U.S. at 590, 593–94. A "very significant" factor is whether the expert's work grows "naturally and directly out of research they have conducted independent of the litigation," or was developed "expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1317 (9th Cir. 1995). And the gatekeeping duty "appl[ies] with equal force to non-scientific expert

witnesses." *Vannes v. Smith*, 2016 WL 1260703, at *4 (M.D. Ga. Mar. 29, 2016).

To be "relevant," and thus assist the trier of fact, the expert testimony must "fit" the facts of the case and "logically advance[] a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312; *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). This rule is stricter than Rule 402 because of the jury impact of expert testimony. *Allison*, 184 F.3d at 1310. Where an expert's testimony does not "fit" a party's liability theory, it must be excluded. *Boca Raton Cmty. Hosp. v. Tenet Health Care.*, 582 F.3d 1227, 1231–32 (11th Cir. 2009).

In the Eleventh Circuit, the Court's gatekeeping duties under *Daubert* apply to class certification. The district court must do a "full *Daubert*" analysis "when an expert's testimony is critical to class certification." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin'l Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014) (citation omitted). And the court "must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Sher v. Raytheon*, 419 F. App'x 887, 890–91 (11th Cir. 2011) (court erred by "not sufficiently evaluating and weighing conflicting expert testimony on class certification."). Courts "assess[ing] commonality for a putative class action" must subject expert reports to a "rigorous analysis" to ensure certification is reliable and does not rest on mere admissible testimony. *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984, 986–87 (9th Cir. 2020). Courts cannot avoid their duty by deflecting these issues to the jury, as that would render *Daubert* a nullity. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

Finally, Rule 403 bars otherwise admissible expert testimony "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Daubert*, 509 U.S. at 595. In making this assessment, the court exercises more control over experts than lay witnesses because "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id*.

## IV.   ARGUMENT

### A.   Witt's Approach Lacks Any Objective Indicia of Reliability

To establish reliability under *Daubert*, the presenting party must provide an "objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316; *accord McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). Experience is not a "sufficient foundation rendering reliable any conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

Where an expert opinion was admittedly created *for litigation* and meets none of the objective factors, it is inadmissible unless the expert shows its objective reliability; the Court cannot find it reliable based on the purported expert witness's say-so. *See Sumner v. Biomet, Inc.*, 434 F. App'x 834, 841–43 (11th Cir. 2011).

Witt admitted he created each of his methodologies solely for litigation. Page Tr. 59:10–13; 103:9–104:7; Bally Tr2 98:5–12; *see also* McClure Tr. 181:20–23. As such, he must meet the *Daubert* factors or "explain precisely how [he] went about reaching [his] conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like." *Reynard v. NEC Corp.*, 887 F. Supp. 1500, 1508 (M.D. Fla. 1995) (quoting *Daubert*

*II*, 43 F.3d at 1318).   But Witt does none of this.   Neither of his rate-setting methodologies was tested, so they cannot generate a known or potential rate of error. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004).   Nor were they subject to peer review or publication.   Bally Tr2 47:3–5; Page Tr. 113:13–24.   Witt cited no actuarial literature supporting his methodological assumptions, Bally Tr2 63:15–19, or any other objective source showing they have been "'practiced by (at least) a recognized minority'" in his field,  *Reynard*, 887 F. Supp. at 1508 (quoting *Daubert II*, 43 F.3d at 1318).   And his rates fail the most basic test of actuarial reliability—they would not work in the real world.   Reynolds 61.   In sum, Witt is an actuary who presents an economic damages model using hypothetical life insurance rates that were never tested under actuarial principles or guidelines.   *Id.*; Bally Tr2. 180:3 –181:13.

Reliability cannot be shown by "'the expert's bald assurance of validity'" because "the reliability prong would be, for all practical purposes, subsumed by the qualification prong," *Frazier*, 387 F.3d at 1261—but we don't even have that here, because Witt disclaims any use of actuarial expertise.   His report states that his opinions were reached "to a reasonable degree of actuarial … certainty," Witt ¶ 7, but he confessed this was "boilerplate," and he could think of *no* calculation he made that "conveys actuarial certainty," Bally Tr2 183:19–184:1; *accord id.* 180:3–23.

## B.    Witt's Count I Model Does Not Fit Plaintiff's Liability Theory

Witt's model also must comply with Rule 702's core relevance rule that an expert's classwide damages methodology fit the "facts of the case" and the liability theory—in this case, Plaintiff's theory of breach. *Daubert*, 509 U.S. at 591.   Witt's model fails that

test because it "does not have a 'valid scientific connection to the pertinent inquiry.'" *Boca Raton*, 582 F.3d at 1232 (quoting *Daubert II*, 43 F.3d at 591–92).

### 1.   Witt's Rates Are Not Based Only on Age, Sex, and Rate Class

"The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact of *that event*."   *Comcast*, 569 U.S. at 38 (quoting Fed. Jud. Ctr., Ref. Man. on Scientific Evid. 432 (3d ed. 2011)).   Courts exclude damages models that fail this relevance or "fit" element.   *Boca Raton*, 582 F.3d at 1233 (excluding expert model because, even though it assessed damages, it included charges "that were not unlawful according to the liability theory"); *accord Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018).

Again, Count I asserts that the Policy required State Farm to consider only the factors listed in the Policy—an "Insured's age on the policy anniversary, sex and applicable rate class" in its cost of insurance pricing.   Yet instead of creating rates based solely on age, sex, and rate class, he purported to create rates based on "mortality factors"—and then took that even further from the Policy by (1) saying that mortality factors mean mortality experience; and (2) equating that concept with the death rate table State Farm used as an early input in its pricing process, and that is mentioned nowhere in the Policy.   *See* Reynolds 9–10.   He did so despite admitting that "the Insured's age on the policy anniversary, sex and applicable rate class" are not the same as the data shown in the table.   Page Tr. 100:23–101:3.   Witt's assumptions make no sense in light of the Policy text or Plaintiff's stated liability theory.   Where and expert's assumptions are "directly contrary" to the plaintiff's theory, exclusion is appropriate.

*Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003); *see also Powell v. Carey Int'l, Inc.*, 2007 WL 1068487, at *4 (S.D. Fla. Apr. 9, 2007).

### 2.   Witt's Disregard of Tobacco Use Creates Substitute Rates That Do Not Fit the Facts Or Any Liability Theory

Witt's decision to ignore the fact that State Farm charged higher rates for smokers further untethers his methodology from the facts. Under Plaintiff's theory, an insurer could charge different rates for smokers and non-smokers, as smoking is a mortality factor—one that Witt admitted insurers consider among the most significant. Page Tr. 83:14–20; *see also* McClure Tr. 81:4–8. Yet he structured his rates to charge smokers and non-smokers the same, on the theory that the company-wide State Farm death rate table from which he chose to derive his substitute rates did not itself segregate death rates between smokers and non-smokers. But it is undisputed that State Farm ***adjusted those death rate numbers*** in its specific pricing process for this Policy to divide all adult Insureds into "Tobacco" and "Non-Tobacco" rate classes. McClure Tr. 71:23–72:2; 77:22–78:1; 79:20–23; 81:4–8; 88:6–21; 133:18–22; 142:4–10.[4] Witt admits State Farm's actual rates charge tobacco users more than non-tobacco users, *id.* 71:23–72:2, and agreed it was "self-evident" that State Farm adjusted its "blended" past mortality data to create separate, higher rates for smokers, Page Tr. 109:9–12. He even agreed that customers would expect the company to make this distinction. McClure Tr. 95:7–11; 96:9–16.

---

[4] State Farm actuary Phipps testified he developed tobacco scalars that were used to adjust mortality data for this Policy. Phipps Tr. 23:13–24:7; 25:3–20; 50:21–55:20. State Farm's pricing file for the Policy discusses these multipliers in detail. *See* Hendren ¶ 54 & Ex. A at 138–41. And the actuarial memorandum Witt cites is to the same effect. Witt Ex. G at 3, 18–20.

And the tobacco distinction is explained to customers.  Witt Ex. B at 16.

An expert cannot ignore relevant data in developing his opinion.  *Martin v. City of Atlanta, Ga.*, 579 F. App'x 819, 826 (11th Cir. 2014) (exclusion where expert omitted key data); *Pierson v. Orlando Health*, 2010 WL 3447496, *3 (M.D. Fla. Aug. 30, 2010) (expert "unreliable" where he made "assumptions and selectively chose data" and "fail[ed] to take into account important facts and data" bearing on the claim).  When an expert "all but cherry pick[s]" data and treats contrary evidence with "unwarranted dismissal" or "outright blindness," the expert report and should be excluded.  *Fail-Safe v. A.O. Smith*, 744 F. Supp. 2d 870, 889 (E.D. Wisc. 2010); *PODS Ent., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014).

Witt's treatment of tobacco means the damages numbers he calculates include amounts State Farm intended for covering mortality risk—namely, the higher risk associated with tobacco use—and not for covering expenses.  McClure Tr. 171:16–24.  Because tobacco use is a distinction that cuts across all adult Insureds, and because this Policy was last sold in 2004, this creates incorrect damages numbers for all or virtually all putative class members.  In *Jacked Up, LLC v. Sara Lee Corp.*, 2018 WL 2064126 (N.D. Tex. May 2, 2018), the court excluded an expert who relied on data from the defendant company's document to calculate lost profits damages but failed to assess the validity of the assumptions in the document.  The court noted that—as is the case here—"many of [the expert's] assumptions conflict[ed] with facts in the record."  *Id.* at *6.  The result of Witt's choice to ignore the increased mortality risk associated with smoking that State Farm builds into its rates for all current Insureds is to disadvantage non-tobacco users

16

(66% of the proposed class) vis-à-vis tobacco users, leading to inaccurate liability findings and individual damages estimates "for every policy that insures individuals aged 20 years or more." Stiroh ¶¶ 29–30; *see also* McClure Tr. 99:25–100:5. Witt's decision to ignore these "basic facts" warrants exclusion. *Boca Raton*, 582 F.3d at 1231–34; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (exclusion warranted where "there is simply too great an analytical gap between the data and the opinion proffered."). Exclusion is proper where "the only connection between the conclusion and the existing data is the expert's own assertions." *McDowell*, 392 F.3d at 1300. And "an expert's failure to explain the basis for an important inference mandates exclusion." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003).

### 3.    Witt's Use of Duration Creates Additional Flaws in his Model

Witt's decision to differentiate his substitute rates by policy duration—rather than using only the temporal factor of "age on the policy anniversary" for "each policy year," McClure Tr. 15:9–11—also produces incorrect damages figures for almost all policyholders. Stiroh ¶¶ 34–37. His injection of an entirely new variable into the substitute rates—one found nowhere in the Policy, and that State Farm does not use, McClure Tr. 13:21–14:6; 130:12–16—compels exclusion. *See Guillory v. Domtar Ind., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (expert's use of "a fictitious set of facts is just as unreliable as evidence based upon no research at all."). Witt's use of this incorrect factor means his substitute rates don't isolate the mortality aspects of State Farm's rates—so both breach and damages would have to be tried independently for each class member to correct for this error.

The effect is clear in Witt's substitute rates. Given Plaintiff's theory that each class member was *overcharged* because State Farm allegedly "loaded" its rates with non-mortality factors, Witt's substitute rates should always be lower than State Farm's, but they often were higher. Witt Tr. 108:5–19, 108:21–110:4; McClure Tr. 160:17–24. Where that occurred, putative class members were not overcharged and suffered no breach. Witt Tr. 113:1–14. This mismatch occurred because Witt's model did not remove expense loads, but created new rates that incorporated assumptions untethered to the facts or Plaintiff's liability theory—including factors that arbitrarily advantaged or disadvantaged entire policyholder groups. McClure Tr. 161:8–15 (admitting discrepancy flowed in part from mismatch between his rates and State Farm's).

Rather than trying to correct his model, Witt just ignored his substitute rates any time they were higher than State Farm's. McClure Tr. 121:7–15; 160:11–16. So his model posits a but-for world where State Farm would charge Witt's rates, but then switch to its own allegedly improper rates whenever they're lower than Witt's. Witt ¶ 73. This litigation-driven tactic, designed to inflate alleged damages, has no grounding in reality or common sense. And Witt had no coherent rationale. Page Tr. 188:3–189:1 (noting it was "not for me to say whether a red flag exists, or if it doesn't make sense" because it is "just the way the numbers work out"); *accord* McClure Tr. 160:17–24.

### C. Witt's Count II Model Fails *Daubert* and Cannot Assess Classwide Damages

Count II asserts that the sentence "The monthly expense charge is $5.00" means that State Farm can't consider expense in developing its cost of insurance pricing.

Compl. ¶ 43.  Count II seeks damages for the allegedly impermissible expense recovery. Witt first tries to apply his Count I model to Count II, Witt ¶ 77, but that fails because the Count I model is flawed and also would exclude profit—a result that can't square with a liability theory designed to exclude *expenses*.  *Bally*, 2022 WL 594798, at *4.

This problem is not solved by Witt's alternative Count II model purporting to subtract mortality and profit from the cost of insurance rates, leaving only an alleged expense "load."  Witt ¶ 78.  Not only it is "impossible" to do this "partitioning," McClure Tr. 179:24–180:6, but Witt reintroduces his Count I substitute "mortality" rates to calculate the "mortality" part of the rate, Witt ¶¶ 87–97, thus importing all the Count I flaws into the Count II model.  And the input he chose to use for the exercise— State Farm's asset share workbooks—do not work for that purpose.

### 1.     Witt's Count II Model Does Not Fit Plaintiff's Liability Theory

Witt admitted the process he used to partition State Farm's rates is something he's never done before, that was ever done at State Farm, or that anyone would do.  Witt ¶ 79 & Ex. S at 269–70; *see also id.*, Ex. E at 132–33; McClure Tr. 181:19–23; Bally Tr2 46:18–22.  He agreed with State Farm's actuary that "State Farm's cost of insurance rates were not partitioned into these categories on the front end, during the pricing process, and they cannot be partitioned in this way on the back end."  Hendren ¶ 64. And he admitted "this is not a typical exercise in my experience to try to partition between expenses and profit."  Bally Tr2 42:23–43:11; 98:10–12; *see also* McClure Tr. 181:19–20.  Indeed, his process was so far beyond what actuaries do when pricing policies that it was "hard for [him] to imagine that any actuary or any person ever would

have gone through this exercise if not for some sort of litigation that … brought this about."  Bally Tr2 98:5–9; *see also* McClure Tr. 181:20–23 (admitting he developed this model only because Judge Breyer rejected his other one).  And he did not cite published actuarial principles or submit his model for peer review, Bally Tr2 46:24–47:3–5.

As noted, the asset share workbooks on which Witt relies, Witt ¶ 80, cannot be used to break State Farm's individual cost of insurance rates into subparts.  They do not tie "any particular revenue source … with any particular expense or category of expenses," Hendren ¶ 28, and contain no formula or calculation for cost of insurance rates, McClure Tr. 76:10–22.  And Witt declined to review other materials that did identify and account for State Farm's expenses—such as State Farm's NAIC Annual Report, which specifically breaks out State Farm's general expenses, *see* Hendren ¶¶ 22–24 & Ex. B, State Farm's expense experience studies used for pricing this Policy, *see id.* ¶ 23 & Ex. C; Bally Tr2 33:1–7, or the Generally Recognized Expense Tables used by actuaries nationwide, *id.* 20:23–21:2.

Witt's process also creates a self-fulfilling prophecy.  To build a method for excluding expenses, one has to define what is and is not an expense.  But Witt didn't try to identify and isolate "what State Farm intended as expense recovery"—that is, which inputs to the process reflected expenses versus taxes, reserves, commissions, surplus, etc.  Rather, he declared everything beyond "mortality" or "profit" as an "expense."  Bally Tr2 24:5–22; 189:23–190:7; McClure Tr. 172:21–173:2.  Although that's not how State Farm treated expenses in its pricing, Hendren ¶ 64, and without any actuarial explanation, Witt just assumed those were the only categories.  Bally Tr2 18:13–19.

20

Witt also included in his "expense" bucket a host of factors that do **not** reflect what State Farm intended (or any insurer would intend) as expense recovery—such as capital and reserve requirements, persistency, and taxes. Bally Tr2 76:21–77:25. He also included factors (like reserves) that indisputably **are** mortality-based, as reserves are set aside to allow the insurer to meet death benefit obligations in later years. Hendren ¶ 65. Witt agreed that certain elements of expense recovery reflect a mortality margin, McClure Tr. 183:16–20, and certain categories, like surplus, fall into his expense and profit buckets *despite* having a mortality component, *id.* 184:13–17. Witt's inclusion of commissions as expenses was also unjustified, as they're not "expenses" in either State Farm's Annual Statement, or its expense studies. Witt ¶ 83; Hendren ¶¶ 24, 65 & Exs. B & C. And Witt admitted commissions normally would be recovered through a premium-related charge, not a monthly expense charge. Bally Tr2 188:6–9. Witt also admitted his methodology treats premium taxes as expenses even though "actuaries [at] life insurance companies do not consider taxes to be expenses." *Id.* 61:4–62:8. He did not compare his expense recovery bucket to what State Farm considered expenses. *Id.* 189:23–190:7. In short, his model deems things expenses without any basis.

This also renders Witt's alternative damages model irrelevant, as it fails to identify amounts State Farm intended to cover expected expenses, much less any part of the cost of insurance charges State Farm *actually* used to cover its expenses. Bally Tr2 20:5–14; 24:5–22, 72:1–7. Expense recovery is just *one factor* in developing cost of insurance rates. Compl. ¶ 39. Yet Witt deemed all these factors "expense recovery," Bally Tr2 65:20–66:5, 76:21–77:3; 79:24–80:6, despite admitting many of these "expenses" are not

treated as unit expenses and some are mortality related, *id.* 61:4–62:8; 66:6–8.  Such a lack of fit warrants exclusion.  *Boca Raton*, 582 F.3d at 1233–34.

Witt's decision to cut off his entire analysis off after 20 years also destroys any connection to any valid liability theory.  He assumed that, after 20 years, "all expenses have been recovered and any future excess [cost of insurance] charges are attributable solely to profit," Witt ¶ 95, but this incorrectly assumes one can cut off a life insurer's mortality-related financial obligations 20 years into a policy.  Hendren ¶¶ 62–63.  This makes no sense because State Farm must pay death benefits well into the future.

Finally, Witt's use of a weighted average for everyone, without distinguishing between smokers and non-smokers, males and females, or different ages, renders it inadmissible as a measure of injury to any one policyholder.  Bally Tr2 122:10–123:6; *see also* McClure Tr. 153:3–8; 154:24–155:5; 179:15–22.  Witt admitted his averaging technique concealed variations on expense treatment by age, sex, and tobacco status, Bally Tr2 120:5–20, yet he ran no tests to see how far his uniform load was from the actual loads, *id.* 125:21–25—a material omission because his use of a blanket percentage hides variations among ages.  Reynolds 78–79.  This itself warrants exclusion.

### 2.    Witt Does Not Identify Damages for Each Class Member

Witt's Count II methodology also cannot identify damages for each putative class member.  His application of a uniform percentage reduction to all customer's monthly cost of insurance charges, Witt ¶ 88, does not work because different Insureds' rates have different profits and expenses, Bally Tr2 128:2–129:9—and if he varied his percentages to reflect age, sex, and smoking, the "loads" would differ*, id.* 120:5–10;

122:16–123:17.  He recognized that tobacco users have higher mortality risks, McClure

Tr. 77:22–78:1; 81:4–8, and that damages would be allocated differently for smokers

and non-smokers if he had accounted for their different mortality risks, *id.* 171:16–172:3;

Bally Tr2 177:2–11.  State Farm's expert showed significant variations in the amount of

expense recovery State Farm included in the cost of insurance rates by age—indeed the

percentage of expense recovery ranges from ▮▮▮ to ▮▮▮▮.  Reynolds 78 & Fig. 12.  Yet

Witt treats all those Insureds the same, opining that they all paid an average expense

recovery of 35.9%.  *Id.*; Witt ¶ 93.  Witt's model fails to calculate any customer's actual

damages, masks variations among class members, and conceals uninjured members.

### D. This Court Must Itself Ensure That Witt's Models Satisfy *Daubert*

Plaintiff insists Witt's testimony should be allowed because other courts let him

testify in other cases, but that would usurp *this Court's* role to "assess the methodology

[an expert] employed in the case at hand," *United States v. Nacchio*, 555 F.3d 1234, 1258

(10th Cir. 2009), lest admissibility turn on the "absurd" premise "'that one can become

an expert simply by accumulating experience in testifying.'"  *Beam v. McNeilus Trauck &*

*Mfg., Inc.*, 697 F. Supp. 2d 1267, 1277 (N.D. Ala. 2010) (citation omitted); *accord Elcock*

*v. Kmart Corp.*, 233 F.3d 734, 744 n.5 (3d Cir. 2000).

Nor have these prior courts made affirmative reliability findings, instead treating

the flaws in Witt's models as mere fodder for cross-examination.  In *Bally*, the court just

found Witt qualified, and noted that "[n]one of [State Farm's] arguments provide a basis

for exclusion." 2022 WL 594798, at *3.[5]  And in *Page*, the court found it enough that Witt was qualified, had testified in other cases, and explained the steps he took. 2022 WL 406415, at *4–6 (W.D. Tex. Feb. 10, 2022).[6]  This is insufficient under *Daubert*.  In the Eleventh Circuit, a court abuses its discretion by abdicating its gatekeeper duty and sending reliability issues to the jury. *McClain*, 401 F.3d at 1237 (court must "insure that speculative and unreliable opinions *do not reach the jury*") (emphasis added); *accord United States v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020) ("dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony' is *not* a reliability determination.").  And an expert's say-so is also not enough: "If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.  Gatekeeping requires a court to ensure the expert's findings are "based on sound science," and make a finding of "some objective independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316.

### E.   Witt Is Not Qualified to Testify To Custom and Practice

Witt's report also includes examples of cost of insurance provisions from other

---

[5]  On Count I, Judge Breyer granted State Farm's summary judgment motion, mooting Witt's Count I model. *Bally*, 536 F. Supp. 3d at 508.  He also held that the plaintiffs could not offer Witt's Count I model for their Count II theory.  2022 WL 594798, at *4.

[6]  Earlier decisions admitting Witt are even less help for Plaintiff.  In *Jaunich*, 2021 WL 5054461 (D. Minn. Nov. 1, 2021), the district court's lone paragraph of analysis just stated that Witt was allowed to testify in *Bally* and *Whitman*. *Id.* at *4.  Those cases have no "full" analysis: *Whitman*, 2021 WL 4264271 (W.D. Wash. Sept. 20, 2021), includes only a single line on *Daubert* citing *Bally*, *id.* at *10, and in *Bally*, 335 F.R.D. 288 (N.D. Cal. 2020), the court's relied heavily on **non-*Daubert*** posttrial review of the jury verdict in *Vogt*, *id.* at 299–300 (relying on *Vogt v. State Farm*, 963 F.3d 753 (8th Cir. 2020)).  Thus, these decisions rest on *Vogt* all the way down.

insurers' policies, apparently to show that it is "common practice in the industry" either to (1) disclose factors an insurer considers in developing its rate schedules or (2) "include qualifying language not present in Form 94030, to indicate that the identified list of factors is not exhaustive." Witt ¶¶ 19–26. But Witt testified he's not "an expert in policy interpretation" or on "life insurance industry custom and practice." Bally Tr1 72:18–73:7; Jaunich Tr. 160:19–161:1. Nor did he explain how these other policy provisions— in policies unrelated to this case—are relevant to his expertise as a damages expert. Bally Tr1 72:18–73:7. Paragraphs 19–26 of his report should be stricken.[7]

## F.   Witt's Testimony Should Be Excluded Under Rule of Evidence 403

Finally, any probative value Witt's opinions might have is outweighed by their prejudicial effect, given the complexities of the ratemaking process, the need for rates to meet regulatory and actuarial standards, and the danger of misleading the jury with complex mortality data dressed up as a damages model. *Frazier*, 387 F.3d at 1263 (given the "powerful and potentially misleading effect of expert evidence," otherwise admissible expert testimony "may still be excluded by applying Rule 403").

## V.   CONCLUSION

For these reasons, State Farm respectfully requests the Court strike the declaration and testimony of Scott Witt.

---

[7] Nor is such a small set a reliable indicator of "industry practice," much less for the period when this Policy was sold—1994–2004. The policies Witt cites were not the result of any "survey," but just examples he "was aware of" or that were "brought to [his] attention by counsel." Bally Tr1 222:2–8; Jaunich Tr. 161:6–14, 164:4–165:1. In *DeBose v. City of Jacksonville*, 2012 WL 13098470, at *4 (M.D. Fla. Feb. 7, 2012), the court excluded a generic opinion as to "custom, pattern, or practice" because the expert had "no information as to how these ten [examples] were selected or whether they are a representative sample." *Id.*

## VI.  Local Rule 3.01(g) Certification

The undersigned counsel conferred with counsel for the opposing party by telephonic means on April 13, 2022.  Opposing counsel objects to this Motion in its entirety.

RESPECTFULLY SUBMITTED this 15th day of April 2022.

/s/ Johanna W. Clark
Johanna W. Clark
**Carlton Fields, P.A.**
200 S. Orange Ave., Ste 100
Orlando, FL 32801
407/849-0300
Fax: 407/648-9099
Email: jclark@carltonfields.com

**Alston & Bird LLP**
Cari K. Dawson (pro hac vice)
Tiffany L. Powers (pro hac vice)
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Cari.Dawson@alston.com
Email: Tiffany.Powers@alston.com

**Gibson, Dunn & Crutcher LLP**
Deborah L. Stein (pro hac vice)

333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7164
Fax: 213-229-6164
Email: dstein@gibsondunn.com

*Attorneys for Defendant*
*State Farm Life Insurance Company*